# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MOHAMAD RAHIM, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO. 3:23cv298 (MPS) |
| | : | |
| ROBERT MARTIN, et al., | : | |
| Defendants. | : | |

## INITIAL REVIEW ORDER

The *pro se* plaintiff, Mohamad Rahim, is a sentenced inmate who filed this civil rights complaint against twenty employees of the Connecticut Department of Correction ("DOC") under 42 U.S.C. § 1983. He asserts claims arising from allegedly unconstitutional conditions of confinement and inadequate medical care at the Corrigan-Radgowski Correctional Center ("Corrigan"). The Prison Litigation Reform Act requires that federal courts review complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). Upon review, the Court must dismiss the complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b).

## I.    ALLEGATIONS

Plaintiff alleges that Counselor Supervisor Dumas ordered him to be placed in a dry cell after Officer Ayotte determined that Plaintiff's urine tested positive for drugs on March 18, 2020. Plaintiff asserts that the dry cell had only a metal bench; lacked a bed and toilet; smelled of urine; and had a sticky floor and walls covered with fecal matter, food, mucous, and insects. Plaintiff allegedly remained in the dry cell for "about" three days without clothing or footwear. Defendants Ayotte and Dumas provided him with an old, wet mattress with mold and urine stains. Unnamed

correction staff members made noises to prevent Plaintiff from sleeping while he was in the dry cell.

On March 18, 2020, Plaintiff showed Warden Martin the unsanitary conditions in the dry cell and informed him that he was having trouble breathing; Warden Martin indicated that this was a consequence of his drug use at Corrigan.

Plaintiff requested to have his hands washed prior to his meals but was only provided with a paper towel. He was allegedly deprived of food and water on some shifts. On March 19, 2020, Officer Blevons denied Plaintiff a lunch meal, made him beg for his lunch and then provided him with a half-eaten meal with a spoon that Plaintiff believed had previously been used by a third party.

Nurse Jane Doe noted Plaintiff's swollen lymph nodes, but Officers Thibadeau[1] and Guellot stated that Plaintiff could not go to the medical unit and that they would keep an eye on him in the dry cell. Later, they denied Plaintiff's request to see a doctor.

On March 20, 2020, Plaintiff tested negative for drugs, but Lieutenant Melton ordered that he remain held in the dry cell.

On December 29, 2020, Plaintiff informed Warden Martin about his poor treatment by correctional staff. In an act of alleged retaliation, Warden Martin moved Plaintiff to a holding cell after he tested positive for COVID-19. Lieutenant Greene escorted him to the holding cell that had a toilet, sink, and a metal bench (but no bunk beds).

On his arrival, Officers Guellot, Griggs, Thibadeau and Boden took all of Plaintiff's property. Officer Guellot made him take off his shoes and stand against the wall while he searched

---

[1] Plaintiff alternatively refers to this defendant as Thibodeau. This ruling refers to the defendant as Thibadeau consistent with the case caption.

Plaintiff. He then told Plaintiff to get into the cell but did not return the property. Officer Guellot returned the property at the end of the shift, but it had been destroyed, with family photographs scattered and missing. Officer Thibadeau stated that Plaintiff's "wife" looked "really sexy" and that he should "hit her up on Facebook." Plaintiff noted that other inmates who tested positive had not been subjected to pat downs or property searches and confiscation.

That day, Plaintiff requested medical attention several times for his breathing and COVID symptoms. Nurse Dawn and Officers Thibadeau, Boden and Griggs arrived at Plaintiff's cell to examine him. She determined that Plaintiff should have been sent to the MacDougall Correctional Institution COVID units for observation for his diminished breathing. Officers Boden and Thibadeau said that Plaintiff was in the holding cell on orders from the warden. Later, Officer Ayotte denied Plaintiff's request to be seen by a doctor.

On December 30 or 31, 2020, Plaintiff moved to a smaller cell that was unsanitary and freezing cold (Plaintiff could see his breath). Warden Martin stated that the freezing temperature would kill the COVID virus.

During his eight to nine days in the holding cell, Plaintiff was not permitted to have any clean clothing or regular or legal mail. He was subjected to lights being turned on early in the morning and verbal abuse by Officer Guellot.

On the last day of Plaintiff's holding cell stay, Counselor Supervisor Dumas informed him that he would move to the Restrictive Housing Unit due to lack of working ventilation that caused the cold temperatures in the holding cell.

## II.    DISCUSSION

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged

conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton,* 126 F.3d 400, 405 (2d Cir. 1997) (citation omitted). A plaintiff seeking monetary damages from a defendant must allege facts that establish the personal involvement of that defendant in the alleged constitutional violation. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). This is also true for supervisory officials. *Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020) (To "hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability.").

The Court construes the complaint to assert claims of Eighth Amendment violations in connection with Plaintiff's conditions of confinement and his medical care at Corrigan; Fourth Amendment privacy violations; Fourteenth Amendment equal protection violations; First Amendment violations based on retaliatory conduct and interference with his legal mail; and Connecticut state constitutional violations.

###    A.    Eighth Amendment Deliberate Indifference

To state a cognizable Eighth Amendment claim for unconstitutional conditions of confinement, a plaintiff must allege facts to show that (1) objectively, "the deprivation was sufficiently serious that he was denied the minimal civilized levels of life's necessities," and (2)  subjectively, that the defendants "acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety." *Washington v. Artus*, 708 F. App'x 705, 708 (2d Cir. 2017) (summary order) (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks omitted)); *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489

U.S. 189, 200 (1989) (listing food, clothing, shelter, medical care, and reasonable safety as examples of basic human needs).

For a medical deprivation, the prisoner must allege facts to show that "(1) objectively, the alleged deprivation of medical care was 'sufficiently serious,' and (2) subjectively, that the defendants acted or failed to act 'while actually aware of a substantial risk that serious inmate harm will result.'" *Washington v. Artus*, 708 F. App'x 705, 708 (2d Cir. 2017) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006)). To be "sufficiently serious," the deprivation of medical care must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011). An inmates' disagreement over the treatment provided does not rise to a claim of Eighth Amendment deliberate indifference. *See Wright v. Rao*, 622 F. App'x 46, 47 (2d Cir. 2015) (citing *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.")). A plaintiff may be able to state a plausible Eighth Amendment claim where a medical provider's decisions do not derive from his or her medical judgment. *Braham v. Perelmuter,* No. 3:15CV1094 (JCH), 2017 WL 3222532, at *17 (D. Conn. July 28, 2017) (noting evidence raised question of fact about whether treatment derived from sound medical judgment).

Thus, to state an Eighth Amendment claim of deliberate indifference to either a medical need or a condition of confinement, a plaintiff must allege facts to suggest that the defendants acted not merely carelessly or negligently, but with a subjectively reckless state of mind akin to criminal recklessness. *See, e.g.*, *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d

Cir. 2013); *Hilton v. Wright*, 673 F.3d 120, 127 (2d Cir. 2012) (*per curiam*); *Collazo*, 656 F.3d at 135. "Officials need only be aware of the risk of harm, not intend harm. And awareness may be proven from the very fact that the risk was obvious." *Spavone*, 719 F.3d at 138.

### 1. Dry Cell Conditions

"[U]nsanitary conditions in a prison cell can, in egregious circumstances, rise to the level of cruel and unusual punishment." *Walker*, 717 F.3d at 127 (holding that allegation of exposure "to human excrement and bodily fluids in a poorly ventilated cell over the course of multiple days" sufficiently alleged objective component of conditions of confinement claim). The inquiry focuses on the "severity and duration" of the conditions." However, the Eighth Amendment is generally not violated by an inmate's temporary or brief exposures to unsanitary conditions of confinement. *Conquistador v. Syed*, No. 3:19CV1450(KAD), 2022 WL 17821092, at *4 (D. Conn. Dec. 20, 2022).[2]

Plaintiff's allegations suggest that the conditions in the dry cell were extremely harsh and unsanitary, although of short duration. For purposes of initial review, the Court permits Plaintiff to proceed on his Eighth Amendment claims for damages against Warden Martin, Counselor Supervisor Dumas, Correction Officer Ayotte, Lieutenant Pearson, and Lieutenant Melton, who plausibly acted with conscious disregard to his unsanitary conditions of confinement.[3]

### 2. Holding Cell Conditions

Plaintiff's allegations raise plausible claims of Eighth Amendment deliberate indifference

---

[2] Plaintiff's allegation that he was provided with only a paper towel to his wipe hands that were sticky while he was in the dry cell does not describe an objectively serious condition to support an Eighth Amendment claim.

[3] Plaintiff has not alleged that any named defendant made noises to interfere with his sleep. Plaintiff's allegation that Officer Thibadeau asked him whether he was hearing "odd" noises is not sufficient to suggest that he was aware of and ignored serious sleep deprivation caused by any correctional staff.

to the unsanitary or freezing holding cell conditions by Warden Martin and Counselor Supervisor Dumas.[4] In addition, Plaintiff suggests an Eighth Amendment violation on the basis of the destruction of his property during a search by Officers Guellot, Griggs, Thibadeau and Boden. *Doyle v. Santiago*, No. 3:19CV901(MPS), 2019 WL 5298147, at *8 (D. Conn. Oct. 18, 2019) (emphasis added) (searches are actionable under the Eighth Amendment "*only if they lack any legitimate penological interest and are intended solely to harass the inmate.*"); *see also Madison v. Crowley*, No. 19CV6554 FPG, 2020 WL 2542636, at *13 (W.D.N.Y. May 19, 2020) (allegations of cell search with vandalization, destruction of personal property, and seizing his legal documents may state an Eighth Amendment claim).[5]

Plaintiff may proceed on damages claims against Warden Martin, Counselor Supervisor Dumas, and Officers Guellot, Griggs, Thibadeau and Boden for Eighth Amendment violations in connection with his confinement in the two alleged holding cells and in connection with the search.

---

[4] Plaintiff cannot, however, state a constitutional deprivation based on his lack of clean clothing for eight to nine days. *See Carolina v. Feder*, No. 3:20CV658 (SRU), 2021 WL 268854, at *8 (D. Conn. Jan. 26, 2021) (noting temporary denials of personal hygiene even for two weeks do not generally implicate constitutional violations).

[5] However, these allegations about property destruction and/or deprivation do not support plausible Fourth or Fourteenth Amendment claims. The Supreme Court has held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984). Nor does the Fourth Amendment apply when property is taken from an inmate's cell. *See id.* at 528 n.8 ("the same reasoning that lead us to conclude that the Fourth Amendment's proscription against unreasonable searches is inapplicable in a prison cell, apply with controlling force to seizures") and at 540 (O'Connor, J., concurring) ("[T]he constitutional sources that provide [prisoners'] property with protection ... [are] the Fifth and Fourteenth Amendments not the Search and Seizure Clause of the Fourth Amendment."); *see also Taylor v. Knapp*, 871 F.2d 803, 806 (9th Cir. 1988) ("[T]he fourth amendment does not protect an inmate from the seizure and destruction of his property."). The Due Process Clause applies to property deprivation without due process of law. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). But a prisoner has no due process claim based on an unauthorized deprivation of property if there is a meaningful state post-deprivation remedy for the loss. *Hudson*, 468 U.S. at 533. The Second Circuit has held that Connecticut provides adequate state post-deprivation remedies. *See Riddick v. Semple*, 731 F. App'x 11, 13-14 (2d Cir. 2018).

Plaintiff has not alleged facts suggesting that Lieutenant Greene acted with a conscious disregard to a risk of harm by escorting Plaintiff to his first holding cell. He claims that his holding cell was not suitable for sleeping but does not allege facts indicating that he experienced serious sleep deprivation as a result of the physical conditions.   He alleges that Officer Guellot turned on the light during early hours, but this conduct does not suggest that he experienced an objectively serious deprivation of constitutional dimension. The Court dismisses the claim as to Lieutenant Greene and dismisses the claim based on turning on the light.

### 3.      Food-related Deprivations

The Eighth Amendment requires that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the inmate's health. *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983). Thus, the Eighth Amendment prohibits correctional officers from maliciously or sadistically contaminating an inmate's food or drink. *See, e.g.*, *Robles*, 725 F.2d at 16 (prison officials' alleged contamination of inmate meals with "dust, rocks, glass and human waste" stated claim for Eighth Amendment violation); *Carter v. Shepperson*, No. 19CV163, 2020 WL 6746789, at *7 (E.D.N.Y. Nov. 16, 2020) (plaintiff stated Eighth Amendment claim against correctional officer who allegedly "tainted [his] food with bleach and feces").

Plaintiff alleges that he was deprived of food and water at times. But his only allegation involving any of the named defendants is that Officer Blevons provided him with a meal that appeared to be half eaten by a third party and that he was provided with what appeared to be a previously-used spoon on the tray. No allegations indicate that Plaintiff was subjected to a serious risk of harm by this meal, which he allegedly consumed without suffering any illness or adverse

health effects. *See Atadzhanov v. City of New York*, No. 21CV5098 (LJL), 2022 WL 4331304, at

*5 (S.D.N.Y. Sept. 19, 2022) (noting plaintiff must allege that he suffered injury as result of being

served contaminated food); *Stokes v. Goord*, No. 9:03CV1402 (LEK/DRH), 2007 WL 995624, at

*4 (N.D.N.Y. Mar. 30, 2007) (dismissing Eighth Amendment claim because records did not

indicate that the plaintiff suffered any adverse health effects from the food served to him by

defendants). Moreover, his claim that the spoon was previously used appears to be based on his

own speculation. *Mustafa v. Stanley*, No. 3:19CV1780 (VAB), 2020 WL 3404065, at *6 (D. Conn.

June 19, 2020) (concluding plaintiff had not alleged serious deprivation based on possible

contamination and lack of any alleged injury).

Accordingly, the Court determines that Plaintiff has not alleged a plausible Eighth

Amendment violation based on any food-related deprivation.

### 4.     Medical Deliberate Indifference

For initial pleading purpose, Plaintiff has sufficiently stated plausible medical indifference

by Nurse Doe, Officer Guellot, Officer Thibadeau, Nurse Dawn, Officer Boden, and Officer

Griggs.

### 5.     Verbal Harassment

Plaintiff alleges Officer Ayotte threatened him with property destruction and referred to

him as a terrorist on December 29, 2020; and that Officer Guellot verbally harassed him after he

woke him up by turning on the light. In the Eighth Amendment context, courts have generally

required that the inmate allege that he suffered some harm of "appreciable injury" from the verbal

harassment rising to a constitutional violation. *See Willey v. Kirkpatrick*, 801 F.3d 51, 70 (2d Cir.

2015) (instructing district court to consider whether plaintiff's "psychological pain" and

subsequent suicide attempt caused by non-physical sexual harassment constituted an "appreciable injury" that was actionable); *see also Burns v. Martuscello*, 890 F.3d 77, 91 (2d Cir. 2018) ("a number of courts have found an Eighth Amendment violation where a guard publicly labels an inmate as a snitch, because of the likelihood that the inmate will suffer great violence at the hands of fellow prisoners."). Here, Plaintiff has not alleged facts indicating that he sustained any harm from the verbal harassment or that any other inmates heard the verbal harassment or name calling so that it would have exposed him to danger. The alleged limited or isolated instances of verbal harassment during Plaintiff's temporary holding cell confinement do not give rise to an Eighth Amendment violation. *See Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (noting limited instances of verbal harassment does not "involve harm of federal constitutional proportions"); *Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir. 2000) (noting that "rudeness and name-calling does not rise to the level of a constitutional violation"); *Green v. Franco*, No. 3:22CV129 (MPS), 2022 WL 1033243, at *6 (D. Conn. Apr. 6, 2022) (noting verbal harassment and threats do not alone rise to the level of a constitutional violation). Accordingly, any Eighth Amendment claims based on verbal harassment are not plausible.

### B.    Fourth Amendment

Plaintiff alleges that Officer Guellot made him stand against the wall for a pat down search prior to his placement in the holding cell. While inmates have no reasonable expectation to privacy within their cells, the Fourth Amendment does provide prison inmates with "a limited right to bodily privacy." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). To state a cognizable bodily privacy claim, an inmate must allege that "(1) he exhibited an actual, subjective expectation of bodily privacy, and (2) prison officials lacked sufficient justification to intrude on the inmate's

Fourth Amendment rights." *Telesford v. Annucci*, 693 F. App'x 1, 3 (2d Cir. 2017) (summary order) (internal punctuation omitted). Plaintiff alleges that he was the only inmate with COVID-19 who was subjected to a bodily search prior to placement in the holding cell, which facts suggest that the search was performed for harassment rather than legitimate penological reasons. Accordingly, the Court will permit Plaintiff to proceed on a Fourth Amendment claim for damages against Officer Guellot.

### C.       First Amendment Retaliation

To plead a retaliation claim, an inmate must plausibly allege: (1) that he engaged in protected speech or conduct, (2) that the defendant took adverse action against the plaintiff, and (3) that the adverse action was the result of a retaliatory motive, i.e., that there was a causal connection between the protected conduct and the adverse action. *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (internal quotation marks and citation omitted). The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Id.* at 295.

Plaintiff alleges that Officer Blevons made him beg for his lunch due to a past verbal altercation. But district courts within this district have generally held that verbal confrontations or arguments between a prisoner and correctional staff are not protected speech under the First Amendment. *Cosby v. McDonald*, No. 3:20CV432(MPS), 2020 WL 5026550, at *6 (D. Conn. Aug. 25, 2020) ("Even if verbal complaints/grievances constituted protected speech, district courts have distinguished between verbal grievances and verbal confrontations or arguments between a

11

prisoner and a correctional officer and have concluded that the latter do not constitute protected speech.") (citing cases).

Plaintiff alleges that Warden Martin retaliated against him for his complaints about staff misconduct by placing him in the holding cell. While this claim involves a verbal grievance that could be considered protected under the First Amendment, Plaintiff's complaint indicates that he was placed in a holding cell due to his COVID positive test along with other COVID positive inmates rather than due to retaliatory animus. Consistent with the Second Circuit instruction to approach retaliation claims with some measure of skepticism, the Court will not permit Plaintiff to proceed on a claim based upon his wholly conclusory assertion that Defendant Martin acted with a retaliatory animus due to his verbal grievance about staff misconduct.

Plaintiff also alleges that Officer Ayotte denied his request for medical treatment, told him that he should stop making complaints, and threatened him with further property confiscation. Construed most broadly, this allegation suggests that Officer Ayotte took retaliatory action by threatening Plaintiff due to his "complaints" (which could plausibly include protected written or verbal grievances). For purposes of initial review, the Court assumes that the threat of property confiscation and the actual denial of medical treatment constitute adverse action. *See Brandon v. Kinter*, 2023 WL 2382637, at *23 (N.D.N.Y. Mar. 6, 2023) (removal from medical diet satisfied adverse action); *Walker v. Senecal*, 2023 WL 3051647, at *5 (N.D.N.Y. Apr. 24, 2023) ("The line between a *de minimis* verbal threat and a retaliatory adverse action hinges on the specificity and seriousness of the words used."). Accordingly, the Court permits Plaintiff to proceed for damages on his First Amendment retaliation claim against Officer Ayotte for further development of the record.

### D.    Mail Interference

"It is well-settled that the First Amendment serves to protect the flow of information to prisoners; thus, any limitations on prisoner access to information must be reasonably related to a legitimate penological interest." *Rapp v. Barboza*, No. 9:13CV0599 (NAM/DEP), 2016 WL 4223974, at *7 (N.D.N.Y. July 19, 2016) (citing *inter alia Turner v. Safley*, 482 U.S. 78, 89-90 (1987)); *see also Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) ("[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment."). Non-legal mail is "afforded less protection than legal mail," and "an isolated failure to mail an inmate's [non-legal] letter does not state a constitutional violation." *Edwards v. Horn*, No. 10 Civ. 6194, 2012 WL 760172, at *7 (S.D.N.Y. Mar. 8, 2012) (citations omitted). "To establish a claim for interference with regular, non-legal mail in violation of the First Amendment, an inmate 'must show a pattern and practice of interference that is not justified by any legitimate penological concern.'" *Singleton v. Williams*, No. 12CV2021, 2014 WL 2095024, at *3 (S.D.N.Y. May 20, 2014) (citation omitted).

Plaintiff alleges that Officers Kusi, Guellot, Thibadeau and Ayotte refused to send or receive his regular and legal mail while he was in the holding cell. Although Defendants may have had a legitimate penological interest in safeguarding against the spread of the COVID virus by not handling Plaintiff's mail, the Court will permit this claim to proceed for further development of the record against Officers Kusi, Guellot, Thibadeau and Ayotte in their individual capacities.

Plaintiff's claim that Defendants refused to send his legal letter implicates his right of access to the courts. *Lewis v. Casey*, 518 U.S. 343, 346 (1996). In assessing whether a state employee has violated that right – here, by allegedly interfering with legal mail – the Court must consider whether Plaintiff has demonstrated an "actual injury," that is, whether he has lost an

opportunity to pursue a nonfrivolous legal claim. *Id.* at 349; *see also Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002). Here, Plaintiff has not alleged any facts indicating that he sustained any such injury. Accordingly, Plaintiff has not stated a plausible access-to-the-courts deprivation.[6]

### E.    Fourteenth Amendment Equal Protection

Plaintiff's complaint suggests Fourteenth Amendment equal protection concerns as he was allegedly treated differently from other COVID positive inmates. To state an equal protection claim, a plaintiff must allege facts showing that: (1) he or she was treated differently from similarly situated individuals and (2) that the discriminatory or different treatment was based on "'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). Even when a suspect classification is not at issue, the Equal Protection Clause still requires that individuals be treated the same as "similarly situated individuals." *Fortress Bible Church v. Feiner,* 694 F.3d 208, 222 (2d Cir. 2012). Thus, a plaintiff may bring a "class of one" equal protection claim "where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Plaintiff has not alleged a membership in a suspect class because prisoners in general are not a suspect class. *See Graziano v. Pataki*, 689 F.3d 110, 117 (2d Cir. 2012).

---

[6] Likewise, Plaintiff's allegations do not support a deprivation of Plaintiff's Sixth Amendment right to effective assistance of counsel, which "only applies to a defendant's trial and first appeal as of right, not to appeals afforded on a discretionary basis, collateral proceedings, or civil proceedings such as civil rights claims challenging prison conditions." *Bourdon v. Loughren*, 386 F.3d 88, 96 (2d Cir. 2004) (citing *Pennsylvania v. Finley,* 481 U.S. 551, 555-57 (1987)). Plaintiff has not alleged that he was prevented from meeting with his attorney in connection with his criminal case or first appeal.

Here, Plaintiff has alleged facts that he was treated differently from other COVID-positive inmates who were also being placed in the holding cells during the same period of time. Accordingly, the Court will permit Plaintiff to proceed on a Fourteenth Amendment equal protection class of one claim against Officers Guellot, Griggs, Thibadeau and Boden in their individual capacities for further development of the record.[7]

### F.    Personal Involvement

Because the doctrine of *respondeat superior* does not apply to constitutional tort claims, a plaintiff in a § 1983 suit must allege facts establishing that the defendants were "personally involved" in alleged deprivations of his constitutional rights. *Thomas v. Ashcroft*, 470 F.3d 491, 496 (2d Cir. 2006); *Wright v. Smith*, 21 F.3d 496, 501 (1994). Specifically, Plaintiff must "plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676).

Of the twenty Defendants named in this suit, several—Lieutenants Ballaro, Ocasio, and Lamontte, and Correctional Officers Clapp, Morison, and Hill—are nowhere mentioned in the complaint's extensive factual allegations. In addition, Plaintiff has not alleged facts reflecting conduct by Defendants Greene or Blevons that suggests a constitutional violation.

Because these Defendants have no alleged involvement in the alleged constitutional deprivations, the claims against them will be dismissed. *See Staton v. Lamont*, 3:22cv854 (VLB), 2022 WL 17251863 at *4 (D. Conn. Nov. 28, 2022) (dismissing claims against defendants unmentioned in the unsevered portion of a complaint); *see also* 28 U.S.C. § 1915(b)(1).

---

[7] Plaintiff states that he was denied benefits of medical care, proper housing, clothing, bed, warmth and sanitary living that were provided to other inmates such as "Tray Hampton etc." This vague and conclusory allegation cannot support a Fourteenth Amendment equal protection claim.

### G.      Official Capacity Claims

Plaintiff seeks declaratory judgment and injunctive relief. To the extent he seeks damages against Defendants, who are state employees, in their official capacities, such claims must be dismissed as barred by the Eleventh Amendment. *See e.g., Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

In *Ex parte Young*, 209 U.S. 123 (1908), the United States Supreme Court recognized a limited exception to the Eleventh Amendment's grant of sovereign immunity from suit to permit a plaintiff to sue a state official acting in an official capacity for prospective injunctive relief for continuing violations of federal law. *Id.* at 155–56; *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005). "A plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for 'prospective injunctive relief' from violations of federal law." *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007).

Plaintiff's request for declaratory judgment about the defendants' failures are barred because the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past." *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993); *see also Green v. Mansour*, 474 U.S. 64, 71 (1985). Likewise, he has not stated any plausible ongoing violation of his federal or constitutional rights to support a claim for injunctive relief. *See Henderson v. Quiros*, No. 3:21CV1078(VAB), 2021 WL 5359739, at *8 (D. Conn. Nov. 17, 2021) (dismissing official capacity claims absent any continuing or ongoing federal or constitutional violation).

### H.      State Constitutional Claims

Plaintiff asserts claims under Article First, §§ 1, 8, 9, and 20 of the Connecticut

Constitution for cruel and unusual punishment and violation of his right to equal protection of the law.[8] In *Binnette v. Sabo*, 244 Conn. 23 (1998), the Connecticut Supreme Court recognized a private cause of action for monetary damages against municipal police officers for violations of Article First, §§ 7 and 9 of the Connecticut Constitution arising from unreasonable search and seizure and unlawful arrest. *Id.* 41-47. In reaching its decision, the Connecticut Supreme Court relied on *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and "emphasize[d] that [its] decision to recognize a *Bivens*-type remedy in this case does not mean that a constitutional cause of action exists for every violation of our state constitution." *Id.* at 47. Here, Plaintiff's claims present new contexts for a cause of action under the Connecticut Constitution, and because recognizing such a cause of action presents a novel and complex issue of state law, the Court declines to exercise supplemental jurisdiction over the state constitutional claims and dismisses them without prejudice to the plaintiff's right to pursue them in state court. *Gothberg v. Town of Plainville*, 148 F. Supp. 3d 168, 187–88 (D. Conn. 2015) (declining to exercise supplemental jurisdiction over state constitutional claim under Article First, § 8); *see also Lopez v. Smiley*, 375 F. Supp. 2d 19, 26 (D. Conn. 2005) (refraining from exercising supplemental jurisdiction over novel and undeveloped state constitutional claims under Article I).

## ORDERS

The Court enters the following orders:

---

[8] Article First, § 1 provides that "[a]ll men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community." Conn. Const. art. I, § 1. Article First, § 8 provides in pertinent part: "No person shall be ... deprived of life, liberty or property without due process of law...." Conn. Const. art. 1, § 8. Article First, § 9 provides that "[n]o person shall be arrested, detained or punished, except in cases clearly warranted by law." Conn. Const. art. I, § 9. Article 20 provides that "[n]o person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin." Conn. Const. Art. 1, § 20.

(1) The case shall proceed on Plaintiff's individual capacity claims for damages for (1) Eighth Amendment deliberate indifference to conditions of confinement against Warden Martin, Counselor Supervisor Dumas, Correction Officer Ayotte, Lieutenant Pearson, Lieutenant Melton, Correction Officer Griggs, Correction Officer Thibadeau, Correction Officer Guellot, and Correction Officer Boden; (2) Eighth Amendment medical deliberate indifference against Nurses Doe and Dawn and Officers Guellot, Thibadeau, Boden and Griggs; (3) Fourth Amendment violation against Officer Guellot; (4) First Amendment retaliation claim against Officer Ayotte; (5) First Amendment mail interference against Correction Officers Kusi, Guellot, Thibadeau and Ayotte; (6) and Fourteenth Amendment equal protection violation against Officers Guellot, Griggs, Thibadeau and Boden.

All official capacity claims are DISMISSED and all state constitutional claims are DISMISSED without prejudice. The Court instructs the Clerk to terminate as Defendants Ballaro, Ocasio, Lamontte, Clapp, Morison, Hill, Blevons and Greene.

(2) The clerk shall verify the current work addresses for Warden Martin, Counselor Supervisor Dumas, Correction Officer Ayotte, Lieutenant Pearson, Lieutenant Melton, Correction Officer Griggs, Correction Officer Guellot, Correction Officer Thibadeau, Correction Officer Kusi, Correction Officer Boden, and Nurse Dawn with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to them at their confirmed addresses within **twenty-one (21) days** of this Order, and report on the status of the waiver request on the **thirty-fifth (35th) day** after mailing. If any defendant fails to return the waiver request, the clerk shall make arrangements for in-person individual capacity service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in

18

accordance with Federal Rule of Civil Procedure 4(d).

(3) The Clerk cannot effect service on Nurse Doe without that Defendant's full name and current work address. Thus, Plaintiff is directed to obtain this information for Nurse Doe during discovery and to file a notice containing the information with the court. Once a defendant Doe has been identified, the court will order that he or she be served with a copy of the complaint. Failure to identify a Doe defendant by the end of the discovery period will result in the dismissal of all claims against that defendant.

(4) The clerk shall mail a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs and the Office of the Attorney General.

(5) Defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If Defendants choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. Defendants may also include any and all additional defenses permitted by the Federal Rules.

(6) Discovery, according to Federal Rules of Civil Procedure 26-37, shall be completed within **six months (180 days)** from the date of this Order. Discovery requests need not be filed with the Court.

(7) The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to both parties by the Court. The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.

(8) All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this Order.

(9) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(10) If Plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. The plaintiff must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If the plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of address. He should also notify the defendants or defense counsel of his new address.

_____/s/_____
Michael P. Shea
United States District Judge

**SO ORDERED** this 26th day of July 2023, at Hartford, Connecticut.